UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Grinnell Mutual Reinsurance Company,

      Plaintiff,

v.                                                      No. 13-cv-664 (JNE/LIB)
                                                      ORDER

Annamarie Martinez Villanueva, as Trustee
for the next of kin of Alyssa Marie Zamarron,
Kelly Stuart Schmidt, and Jerome Allan Schmidt,

      Defendants.

---

This matter is before the Court on the parties' cross motions for summary judgment. ECF Nos. 36 and 41. For the reasons discussed below, the Plaintiff's motion is denied and the Defendants' motion is granted.

**Background**

The Defendants are Jerome and Kelly Schmidt, a father and his adult son who operate a farm together in Worthington, Minnesota. In May of 2012, the Schmidts hosted a party at the farm to celebrate the 12th birthday of Kelly's daughter Madison. Madison's friend Alyssa Zamarron, who was 10 years old, attended the party and stayed for a sleepover. The next day, the two girls took turns driving the Schmidts' ATV around the property over the course of several hours, during which time the Schmidts were outside working. That evening, as Alyssa was driving the ATV with Madison along as a passenger, the vehicle collided with a tree. Alyssa was thrown from the ATV and, tragically, died from her injuries.

Soon after Alyssa's death, her mother Annamarie Villanueva commenced a wrongful death action against the Schmidts in Minnesota state court, alleging negligent supervision. The

1

Schmidts, who had purchased a farm insurance policy from Plaintiff Grinnell Mutual Reinsurance Company and non-party Heartland Mutual Insurance Company, tendered their defense to Grinnell.  In response to that tender, Grinnell informed the Schmidts that their policy "appears to provide [them] with coverage for this loss" up to the $300,000 policy limit, and it hired an attorney to defend the case.  Grinnell did not issue a reservation of rights letter at that time.

Grinnell did, however, advise the Schmidts to consider hiring separate counsel due to the possibility of exposure above the $300,000 policy limit.  The Schmidts did so in November 2012, and the case proceeded through the winter of 2013.

In March of 2013, Grinnell sent the Schmidts a letter reserving its right to deny coverage and withdraw its defense at any time.  Grinnell explained that "[i]t has recently come to our attention that there is a question as to whether the Farmate Farm Policy . . . will provide you with coverage for all of the damages alleged in the Complaint" in the wrongful death action.

Grinnell subsequently filed this case seeking a declaratory judgment that it owes no duty to defend or indemnify the Schmidts.[1]  In April of 2013, shortly after Grinnell filed its Complaint here, the wrongful death action settled for $462,500, to which Grinnell contributed $100,000 conditioned on the outcome of this case.  The Schmidts then filed an Answer asserting several affirmative defenses, including estoppel and the doctrines of reasonable expectations and illusory coverage.  The Schmidts also asserted a breach of contract Counterclaim against Grinnell for failing to pay the full $300,000 policy limit towards the settlement.

Discovery is now complete, and the parties have each moved for summary judgment.  With the underlying lawsuit having been resolved, the sole remaining dispute here is over

---

[1]  Grinnell's Complaint also named Annamarie Villanueva as a Defendant, but she was dismissed from the case by stipulation in January of 2014.  ECF No. 31.

indemnification. The stakes of that dispute are whether the Schmidts must repay Grinnell for the $100,000 contribution it made towards the settlement, or whether Grinnell must contribute an additional $200,000.

## Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The motions before the Court turn on whether the farm insurance policy the Schmidts purchased obligates Grinnell to cover, to the $300,000 policy limit, the liability they incurred as a result of the ATV accident in which Alyssa Zamarron was fatally injured. The interpretation of that policy is a matter of state law, *Allstate Ins. Co. v. Blount*, 491 F.3d 903, 908 (8th Cir. 2007), and the parties do not dispute that Minnesota law applies in this diversity action. *See Progressive Northern Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010) ("Minnesota law applies, as Minnesota is the forum state and neither party has raised a choice-of-law claim.").

Under Minnesota law, "[i]nterpretation of an insurance policy is a question of law . . . . If the language of an insurance contract is unambiguous, it must be given its plain and ordinary meaning. . . . But if the language is ambiguous, it will be construed against the insurer, as drafter of the contract." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894 (Minn. 2006) (citations omitted).

Further, Minnesota law prescribes a two-step process for analyzing an insurance coverage dispute: first, "the insured bears the initial burden of demonstrating coverage"; if that burden is met, then "the insurer carries the burden of establishing the applicability of exclusions." *Id.*

Those "exclusions are construed narrowly and strictly against the insurer . . . and, like coverage, in accordance with the expectations of the insured." *Id.*

As explained below, the Schmidts have satisfied their initial burden of demonstrating coverage for their liability in the underlying wrongful death lawsuit, but Grinnell has not met its burden of establishing the applicability of any exclusion. Summary judgment in favor of the Schmidts is therefore warranted.

### I. Insurance policy.

The farm insurance policy at the center of this dispute was issued jointly by Grinnell and Heartland to Jerome and Kelly Schmidt and was in effect from March 6, 2012 through March 6, 2013. The policy provides both property and liability coverage; Heartland is identified as the property insurer, and Grinnell as the liability insurer.

The liability, or "Farm-Guard," portion of the policy begins with a "form concurrency provision," which states as follows:

> If "your" policy consists of two separate coverage parts, one insuring "your" property exposures and the other insuring "your" liability exposures, any liability provisions contained in the general policy provisions of the property coverage are void. The liability coverage is described only in this form, including any attached endorsements and the Declarations.

Therefore, to determine whether the policy obligates Grinnell to indemnify the Schmidts for their liability in the underlying suit, the Court looks to the terms of the Farm-Guard liability policy, its endorsements, and the Declarations.

The main text of the Farm-Guard policy provides four different types of coverage, subject to a number of exclusions and to the limits set forth in the Declarations. Those areas of coverage are as follows:

4

- "Coverage A – Liability to public" provides that "'we'[2] will pay compensatory damages for which any 'insured' becomes legally liable as a result of 'bodily injury' or 'property damage' caused by an 'occurrence' to which this coverage applies." The Declarations set the limit of this coverage at $300,000 per occurrence and $600,000 annual aggregate.

- "Coverage B – Medical payments to public" provides that "'we' will pay the reasonable expenses incurred for the necessary first aid, medical, surgical, hospital, licensed nursing, ambulance, x-ray, dental, and funeral services, prosthetic devices, eye glasses, hearing aids, and pharmaceuticals. The 'bodily injury' for which the expenses are to be paid must arise from an 'occurrence' to which this coverage applies" and be sustained either while on the "'insured premises' with the permission of any 'insured'" or elsewhere if the injury is caused by any "insured" or arises under certain enumerated conditions. The Declarations set the limit of this coverage at $5,000 per person.

- "Coverage C – Liability to farm employees" provides that "'we' will pay compensatory damages for which any 'insured' becomes legally liable as a result of 'bodily injury' sustained by a 'farm employee' while engaged in the employment of any 'insured' and caused by an 'occurrence' to which this coverage applies." The Declarations set the limit of this coverage at $300,000 per occurrence and $600,000 annual aggregate.

- "Coverage D – Medical payments to farm employees" provides that "'we' will pay the reasonable expenses incurred for the necessary first aid, medical, surgical, hospital, licensed nursing, ambulance, x-ray, dental, and funeral services, prosthetic devices, eye glasses, hearing aids, and pharmaceuticals" necessitated by a "bodily injury" sustained by a "farm employee" while engaged in the employment of any "insured" and caused by "an 'occurrence' to which this coverage applies." The Declarations set the limit of this coverage at $5,000 per person.

In the broadest of strokes, then, the Farm-Guard policy at Coverages A and C indemnifies the Schmidts against legal liability to members of the public and to their farm employees arising out of particular types of "occurrences," meaning "an accident, as perceived from the viewpoint of a reasonable person, causing unexpected 'bodily injury' or 'property damage' during the policy period." In addition, at Coverages B and D, the Farm-Guard policy provides for modest

---

[2] The policy defines "we," "us," and "our" to "mean the Company providing this liability insurance. These terms do not refer to the Company providing the property coverage in another coverage part or policy." Simply put, "we" means Grinnell, not Heartland.

5

payments for the medical expenses of members of the public and farm employees who are injured in particular types of "occurrences" connected to the Schmidts or their farm, without regard to the Schmidts' legal liability.

**II.      Coverage.**

Specifically at issue here, of course, is the Schmidts' legal liability for Alyssa's death, which resulted from the ATV accident that occurred on the Schmidts' farm.  As such, the Farm-Guard policy's "Coverage A – Liability to public" is implicated, as is a Select Recreational Vehicle Limited Liability Coverage endorsement attached to the policy.

Grinnell does not dispute that, were the main text of the Farm-Guard policy to stand on its own, Coverage A would obligate it to pay the policy limit of $300,000 towards the wrongful death settlement.   Under that coverage, Grinnell agreed to "pay compensatory damages for which any 'insured' becomes legally liable as a result of 'bodily injury' or 'property damage' caused by an 'occurrence' to which this coverage applies."  According to the definitions section of the policy, the term "insured" includes the Defendant Schmidts as the named insureds, and "bodily injury" includes death resulting from bodily harm.

Furthermore, the policy defines "recreational vehicle" to include "[a]n all-terrain vehicle (ATV) when not being used in an agricultural operation," and "Recreational Vehicle Liability" includes "[l]iability for 'bodily injury' or 'property damage' arising out of the . . . [m]aintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person [or f]ailure to train or supervise or negligent training or supervision of any person involving such vehicle or craft by any 'insured . . . ."  The policy specifies that Grinnell "do[es] not cover any

'Recreational Vehicle Liability' unless at the time of the 'occurrence' the involved 'recreational vehicle' is . . . [b]eing operated on the 'insured premises.'"

Therefore, because Alyssa was operating the ATV on the farm property and not in an agricultural operation, these provisions in the main text of the Farm-Guard policy would provide coverage for the liability the Schmidts incurred on the negligent supervision claim brought against them in the underlying wrongful death suit.

With that said, provisions of the Select Recreational Vehicle Limited Liability Coverage endorsement are applicable to the ATV accident as well. Under Minnesota law, "[a] policy and endorsements should be construed, if possible, as to give effect to all provisions, but where provisions in the body of the policy conflict with an endorsement or rider, the provision of the endorsement governs." *Bobich v. Oja*, 104 N.W.2d 19, 20-21 (Minn. 1960). *See also Auto Club Ins. Ass'n v. States Sentry Ins.*, 683 F.3d 889, 891 (8th Cir. 2012) ("Specific provisions in a contract govern over more general provisions.") (citing *Burgi v. Eckes*, 354 N.W.2d 514, 519 (Minn. Ct. App. 1984). Therefore, the terms of the endorsement govern this coverage question.[3]

And Grinnell does not dispute that the Schmidts satisfy their initial burden of establishing coverage under the endorsement. With the endorsement, Grinnell agreed to "pay damages for which any 'insured' is legally liable because of 'bodily injury' or 'property damage' arising out of an 'occurrence' involving the ownership, maintenance, or use of a 'select recreational

---

[3]   The Schmidts argue that, if they would have had coverage under the terms of the main Farm-Guard policy standing alone but not under the Select Recreational Vehicle Limited Liability Coverage endorsement, estoppel principles and the doctrines of reasonable expectations and illusory coverage would operate in the circumstances of this case to require Grinnell to provide them coverage. However, because the Schmidts are covered under the endorsement, the Court need not address these arguments.

7

vehicle.'" The policy's Declarations identify the ATV involved in Alyssa's accident as a "select recreational vehicle."[4]

### III. Exclusions.

The heart of the parties' dispute, however, is whether one of the exclusions specified in the endorsement applies so as to defeat coverage. That exclusion reads in relevant part as follows:

> Under B. ADDITIONAL EXCLUSIONS UNDER COVERAGE A – LIABLITY TO THE PUBLIC, the following Exclusion is added.
>
> "We" do not cover "bodily injury" to any "insured".

This exclusion is significant in these circumstances because the endorsement also specifies that, "[w]ith respect to COVERAGE A – LIABILITY TO THE PUBLIC, an 'insured' includes any person operating 'your' 'select recreational vehicle' with 'your' express permission."

In combination, then, these provisions of the endorsement exclude from coverage any liability the Schmidts may incur for "bodily injury" sustained by any person "operating 'your' 'select recreational vehicle' with 'your' express permission." Whether this exclusion negates the coverage that would otherwise have been available to the Schmidts for their liability arising from Alyssa's accident thus turns on (1) the meaning of "'your' express permission" and (2) whether Alyssa had it when she was operating the ATV at the time of the accident.

---

[4]   It bears emphasizing that the Schmidts' ATV is thus insured by a farm policy, not an automobile policy. Like a homeowner's policy, a farm policy "is not designed for the protection of the greater public welfare" as are automobile liability policies, "but for the protection of the [farmer] on his private property." *North Star Mut. Ins. Co. v. Raincloud*, 563 N.W.2d 270, 273 (Minn. Ct. App. 1997).

8

### A. Meaning of terms.

The parties agree that the ATV involved in the accident is identified in the policy as a "select recreational vehicle" and that Alyssa was "operating" it when the accident occurred. *See West Bend Mut. Ins. Co. v. Milwaukee Mut. Ins. Co.*, 384 N.W.2d 877, 880 (Minn. 1986) ("We think it is generally understood and accepted that a motor vehicle is operated by one person, namely, the person in the driver's seat and at the controls."). They disagree, however, about whether she was operating the ATV with "'your' express permission."

#### 1. Your.

The policy defines "you" and "your" to mean, in relevant part:

a. The Named Insured shown in the Declarations and, if the Named Insured is an individual, the spouse if living in the same household;

b. Any Additional Named Insured shown in the Declarations and, if the Additional Named Insured is an individual, the spouse if living in the same household[.]

The Declarations show only the Defendants Jerome and Kelly Schmidt as Named Insureds, and there are no Additional Named Insureds.

After initially arguing that the exclusion would apply if the facts showed that Kelly Schmidt's daughter Madison had given Alyssa express permission to operate the ATV, Grinnell conceded that Madison's express permission would be insufficient to trigger the exclusion. Madison is not included within the policy's definition of "your," and indeed, the Minnesota Court of Appeals has held that the "initial permission rule" – whereby the owner of a vehicle, having given permission to use the vehicle to a permittee, is deemed to have given permission to anyone to whom that permittee gives express permission – "is not applicable to situations involving ATVs." *North Star*, 563 N.W.2d at 272.

9

Furthermore, even if the initial permission rule from the automobile insurance context did apply in these circumstances, an express grant of permission from Madison to Alyssa could only possibly be deemed to be *implied* permission from the Schmidts to Alyssa. The implied permission that Minnesota courts have found under the initial permission rule exists inferentially by operation of law; it is not express permission as that term is plainly and ordinarily understood: "when an owner expressly consents to a driver who then expressly consents to a third party[, t]he owner has then *impliedly* consented to use by the third party*.*" *State Farm Ins. Co. v. Vasquez*, 1996 WL 722089, *2 (Minn. Ct. App.. Dec. 17, 1996) (emphasis added).

For the exclusion to apply, Alyssa must therefore have received "express permission" to operate the ATV from either Jerome or Kelly Schmidt or one of their spouses, if living in the same household.

### 2. Express permission.

The policy nowhere defines the term "express permission." As noted above, an unambiguous term in an insurance policy "must be given its plain and ordinary meaning," while an ambiguous term "will be construed against the insurer, as drafter of the contract." *Travelers Indem. Co.*, 718 N.W.2d at 894. *See also American Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn. 2001) ("When interpreting an insurance contract, words are to be given their natural and ordinary meaning and any ambiguity regarding coverage is construed in favor of the insured.") (citation omitted).

Furthermore, under Minnesota law, "[i]n the absence of a definitional clause, it is proper for the Court to consider the dictionary meaning of the word." *Aetna Ins. Co. v. Getchell Steel Treating Co*., 395 F.2d 12, 16 n.4 (8th Cir. 1968) (citing *Lang v. Gen. Ins. Co. of America*, 127

N.W.2d 541, 545 n.2 (Minn. 1964)). Grinnell and the Schmidts both cite a string of Minnesota Court of Appeals decisions that draw upon Black's Law Dictionary to define "express" in other contexts. Black's defines "express" as an adjective meaning "[c]learly and unmistakably communicated; directly stated. Cf. IMPLIED." The Schmidts also cite an additional Minnesota Court of Appeals decision drawing upon The American Heritage Dictionary definition of "express" as "definitely and explicitly stated, as well as particular and specific."

From these sources, the parties offer different interpretations of the meaning of "express permission." Grinnell argues that the term simply requires that "clear and unmistakable" permission have been given, however communicated or understood. The Schmidts, however, argue that to be "express," the permission must have been "clearly, unmistakably, and explicitly stated, and not implied or left to inference."

The Schmidts have the better of this argument. Grinnell's formulation of "express permission" – as is clear from its attempts to apply it to the record evidence – would render the word "express" superfluous. Grinnell drafted the policy language at issue here, and in so doing could have specified in the endorsement that "express or implied permission" would suffice. Grinnell also could have simply required that any kind of "permission," without qualification, have been given – as it did in the text of "Coverage B – Medical payments to public," which by its terms applies to any person injured "[o]n an 'insured premises" with *the permission* of any 'insured' . . . ."

But Grinnell did not take either of those avenues. "Express" modifies "permission" in the endorsement, and it must therefore be given its plain and ordinary meaning. That meaning is perhaps most easily seen when "express" is contrasted with "implied," as Black's definition

suggests. Black's itself defines "implied" as "[n]ot directly expressed; recognized by law as existing inferentially . . . ."

Moreover, in construing the phrase "express or implied permission" as that term appears in omnibus clauses in automobile insurance policies, Minnesota courts have long distinguished these two types of permission based on the presence or absence of a verbal statement. For instance, "express permission" to operate a vehicle has been found: when the mother of a 12-year old directly asked the owner of an ATV if her daughter could drive the ATV, and the owner assented, *North Star*, 563 N.W.2d at 271-72; and when a father explicitly instructed his son to move one family vehicle from the street in front of their home to the garage and another vehicle from the garage to the street, *Jones v. Fleischhacker*, 325 N.W.2d 633, 635 (Minn. 1982). *See also State Farm Fire & Cas. Co. v. Ricks*, 902 S.W.2d 323, 324 (Mo. Ct. App. E.D. 1995) ("To be express, permission must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference.") (internal citation and quotations omitted).

In contrast, "implied permission" to operate a vehicle has been found: when a close friend of the owner of a vehicle used the vehicle without express permission, as he had on a number of prior occasions "without objection by the owner," *Stewart v. Anderson*, 246 N.W.2d 576, 578 (Minn. 1976); and when a grandson used his grandfather's automobile without express permission, as he had on prior occasions, and the grandfather had also given the grandson his own set of keys to the automobile, *Beebe v. Kleidon*, 65 N.W. 614, 616-17 (Minn. 1954), *overruled on other grounds by Johnson v. Sleizer*, 129 N.W. 761 (Minn. 1964).

Minnesota requires that "[i]nsurance contract exclusions [be] construed narrowly and strictly against the insurer," *Travelers Indem. Co.*, 718 N.W.2d at 894, and "undefined terms

12

subject to multiple interpretations are interpreted in favor of coverage," *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (Minn. 2009). Consistent with these principles, the term "express permission" as used in the endorsement requires that the permission (perhaps tautologically) be expressed – that is, it must be clearly, directly, and unmistakably stated. "Express permission" may not be left to implication, inference, assumption, or extrapolation.

**B. Facts.**

With the terms thus defined, it is left to consider whether the record, construed in the light most favorable to Grinnell, demonstrates that Alyssa was operating the ATV with the "express permission" of either of the Defendant Schmidts or their spouses. It does not.

In its recitation of the relevant facts, Grinnell asserts that

> [i]t is . . . undisputed that Madison always had permission to use the ATV and the right to give permission for other people to drive it.[5] (K. Schmidt, p. 14; M. Schmidt, pp. 13-16.) On the day of the accident Madison gave Zamarron express permission to drive the ATV. (M. Schmidt, pp. 16, 18.) Specifically, Zamarron asked Madison if she could drive the ATV and Madison said "yes." (M. Schmidt, p. 16.)

---

[5] It is clear that Madison was allowed to use the ATV without the express permission of her father (Kelly Schmidt) or grandfather (Jerome Schmidt), but the Schmidts contest Grinnell's assertion that the record shows that Madison had "the right to give permission for other people to drive it."

In Madison's deposition, she testified that she had learned to drive an ATV at the age of four or five. According to her, it was long understood that she did not have to ask permission and could "go and get" the family's ATV on her own, or with her friends or cousins, so long as her father or grandfather were on the premises.

Prior to the accident, Madison had invited Alyssa over only once, and while Madison had taken the ATV out on that occasion, she could not remember if Alyssa had driven it. On the day of the accident, and consistent with her prior practice, Madison took the ATV out with Alyssa without asking permission from either her father or grandfather, who were both at the farm. At some point thereafter, Alyssa asked Madison if she could drive the ATV. Madison consented, on the condition that she ride on the ATV with Alyssa. Madison and Alyssa then took turns driving the ATV over the course of several hours.

In his deposition, Kelly Schmidt testified that he had never let children who were not his own operate the family's ATV.

> . . . Both [Jerome and Kelly Schmidt] were present and watching while the girls drove the ATV on the day of the accident. (M. Schmidt Depo. Exh. 1, p. 43; K. Schmidt Depo. Exh. 1; K. Schmidt Depo. Exh. 2, p. 48; J. Schmidt Oct. 16, 2012, Depo., pp. 12, 22; Exh. D.) Defendants did nothing to restrict the children's use of the ATV. (K. Schmidt Depo. Exh. 2, p. 31.)
>
> Kelly Schmidt saw Zamarron driving the ATV. (K. Schmidt Depo. Exh. 1; K. Schmidt Depo. Exh. 2, p. 36; Exh. D.) In fact, he believed she was driving appropriately and did not see her drive the ATV inappropriately. (K. Schmidt Depo. Exh. 2, p. 36; Exh. D.) However, at one point Jerome Schmidt told Madison both she and Zamarron needed to slow down when they were driving the ATV. (M. Schmidt, 23.)
>
> Independent witnesses Eric Bremer and Josh Tangeman also observed Zamarron drive the ATV while both Defendants were present. (Bremer, pp. 13-14; Tangeman, p. 13.)

Plaintiff's Memorandum in Support of Motion for Summary Judgment at 17, ECF No. 38.

Even this view of the material facts does not support Grinnell's assertion that Alyssa had the Defendant Schmidts' express permission to operate the ATV. Madison and Alyssa took the ATV out on the day of the accident without asking for or receiving express permission from the Schmidts; Alyssa asked Madison for express permission to drive the ATV, which Madison gave her; both of the Schmidts then saw Madison and Alyssa taking turns driving the ATV; and, while Jerome Schmidt warned Madison that they should slow down, neither of the Schmidts told either of the girls to stop driving.

These facts would certainly be more than enough to demonstrate that Alyssa was operating the ATV with the tacit or implied permission of the Schmidts. But Alyssa had no interaction at any time with either of the Schmidts regarding her operation of the ATV. The Schmidts' failure to stop Alyssa from operating the ATV, even coupled with Madison's express permission and Jerome Schmidt's warning to Madison about the girls' driving, is insufficient to show that Alyssa was operating the ATV with the Schmidts' express permission.

The record demonstrates that the Schmidts undoubtedly acquiesced in Alyssa's operation of the ATV, but the endorsement language that Grinnell drafted requires that their permission have been "express." It was not.

## Conclusion

"There being no dispute about the facts, the only question to be answered is whether, as a matter of law, [the Schmidts' legal liability in the underlying suit is] covered under Grinnell's policy." *Grinnell Mut. Reinsurance Co. v. Schwieger*, 685 F.3d 697, 700 (8th Cir. 2012). Because the Schmidts have met their burden of demonstrating coverage for that liability under the Select Recreational Vehicle Limited Liability Coverage endorsement, and Grinnell has not established the applicability of any exclusion, the answer to that question is yes.

Based on the files, records, and proceedings herein, and for the reasons discussed above, IT IS ORDERED THAT:

1. Plaintiff's Motion for Summary Judgment [ECF No. 36] is DENIED.
2. Defendants' Motion for Summary Judgment [ECF No. 41] is GRANTED.
3. Defendants' Motion for Extension of Time [ECF No. 51] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 1, 2014

s/Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge